### James A. Bass et als. *v.* R. J. Chambliss, Executor.

Where an administrator's account has been homologated, he will not be liable, under the Act of 1837, to pay interest on the balance in his hands.

It is the duty of an administrator to use all legal means to collect from the succession of his predecessor in office the balance due to the estate, and he will be bound for the loss which may result to the estate in consequence of his failure to do so. Yet this delinquency does not subject him to pay the interest imposed by the *?*ct of 1837, on Executors who have failed to deposit money collected in bank, and he will only be bound to pay five per cent. interest.

The charge made by an administrator for lawyer's fees for the preparation of his account, will not be allowed, when, by his delay, he has compelled the heirs to sue for its rendition.

Where the executor has been guilty of great irregularity in keeping his accounts—of omissions to report annually—of mingling the affairs of the estate with his own, of an unjustifiable concealment of funds received and arrangements made with debtors—of a use of the trust funds, and a continuous effort during a long period to protract the litigation and keep the heirs out of their estate, he will be subject to the application of the rule, " *Omnia presumunter contra spoliatorem.*" SLIDELL, C. J.

An Executor who has incurred a liability at a particular date for a sum of money, by reason of his mal administration, is as much bound for interest as if he had actually received cash belonging to the succession, for the statute of 13th March, 1837, imposed the obligation to pay ten per cent. interest, not only on cash actually collected, but " on all sums for which he may be responsible." SLIDELL, C. J., dissenting.

Discussion of the rights, duties and obligations of administrators.

APPEAL from the District Court of the parish of Carroll, *Perkins*, J. *Short & Parham, Stacy & Sparrow*, and *Geo. S. Yerger*, for plaintiff:

1. The non-payment of interest will be resisted, because it is said, neither the code nor the statute law of the State make any provision for the payment of interest by executors, administrators, curators, or persons who occupy a fiduciary relation, except in the case of tutors; and because, if interest could be charged ordinarily, it ought not to be charged in this case, as the fund in the executor's hands arose principally from notes collected, which had from one to ten years to mature; and that, by the directions of the will of *Job Bass*, the fund was not to be distributed to the heirs until the last note fell due, to-wit, in 1845.

The Code (see Articles 2894, 2895, 2896, 1929, 1930, 1931,) provides what shall be the rate of judicial and conventional interest on loans of money, or the withholding of money due by contract. It also specifies the cases wherein interest shall be recovered. All of which contemplate the relation of debtor and creditor, or a contract, express or implied. It is therefore granted, that there is no express provision made for payment of interest on money in the hands of trustees, executors or administrators. But the court will notice, that this is also the case in the statutes of Great Britain, New York, and all, or nearly all, of the States in the American Union. See English Statutes, New York Statutes, North Carolina Statutes, &c.

If, therefore, this objection were a good one, it would prove that the British courts, and the courts of the American States, have been most lamentably ignorant upon the subject.

Bass et als.
v.
Chambliss.

But the argument is founded on a total misapprehension of the question. Interest is not, and never has been adjudged against trustees, upon the ground that it is given by statutory enactment, or the positive provisions of a code. Nor is it given by any analogy to such statutory provision. Trustees are charged upon a distinct principle—a principle of universal jurisprudence—a principle of sound, enlightened policy. It is this: that trustees will not be permitted to use the trust fund for their individual benefit, nor will they be permitted to trade with the fund, or make profit on it, or use it any way inconsistent with the terms of the trust; nor to retain it, where it is their duty to invest it, or to pay it over.

All these, and similar cases, are viewed in the light of breaches of trust; and the trustee must be held to account for the profits or benefit he has derived from the fund, which, generally, not having kept distinct from his own, can not be ascertained; therefore, the courts look to the statutes regulating interest, to ascertain the value of money, in order to ascertain the profit or benefit the trustee has derived from the use of the trust fund.

It matters not what name we give to the party who occupies a *fiduciary* relation. Whether he is called executor, curator, tutor, guardian, or trustee, the general principles above laid down must apply. In Louisiana, executors, administrators, &c., are trustees, (2d Annual Rep. 923); and in Louisiana, as in other States, an express trust may be created. *Hope* v. *State Bank*, 4 L. 213. *Malone* v. *Barker*, 2 R. 369. *Caldwell* v *Hermen*, 5 R. 20.

If, therefore, there were no positive enactment, stating what rule should prevail in cases where the code or statutory law is silent, the courts of Louisiana would be governed by those principles of justice and equity, generally recognized by enlightened nations.

But the 21st Article of the Civil Code, furnishes a clear rule for the court, in cases not provided for by positive law. It enacts, "in civil matters, where there is no express law, the judge is bound to proceed and decide according to equity. To decide equitably, an appeal is to be made to natural law and reason, or received usages, where positive law is silent."

The construction of this Article is, that the courts of Louisiana, in such cases, will look to the decisions of courts in other States, in analogous cases, for the rule to govern them. *Delezardo* v. *Gossett*, 1 Ann. 139. *Gredly* v. *Conner*, 2 Ann. 87. *Brown* v. *In. Co.*, 3 Ann. 177. *Slarke* v. *Burke*, 5 Ann. 740; 5 Ann. 720; 4 A. 209, 210; 13 L. 198, 199; 12 M. 498.

Looking then to the decisions of courts of equity in England and America, and also to the civil law, we find it laid down, as a principle of universal jurisprudence, that trustees can only hold and act for their beneficiaries; that all profits and gains enure to their use, and that interest, sometimes simple, sometimes compounded, will be given as the standard or value of the money used.

Thus, the trustee is liable for profits, or interest, where he does not keep accurate and regular accounts, so as to be always ready with them. Willis on Trustees, 125, 176, 177 side page. 14 Vesey, 510. 1 Jacob and Walker, 140. 3 Mer. 43.

Or, where he omits to distribute at the time required by law, or by the terms of the trust. *Grey* v. *Thompson*, 1 John. Ch. 85.

Or, where he mingles trust money with his own, or uses it, or trades with it, or makes a profit on it by way of interest or otherwise, or fails to invest where it is his duty to do so. *Munford* v. ————, 6 John. Ch. Rep. 1. 2 Story's Equity, sec. 1277. *Duncomb* v. *Duncomb*, 1 John. Ch. 508, 527. 2 Dev. & Battle, Ch. Rep, 339. 4 John. Ch. Rep. 305. 1 John. Ch. Rep. 620, 629. Lewin on Trusts, 327, 328.

Such, also, is the rule of the civil law. See 2 Story's Eq., sec. 1277—note to sec. 1268. 1 John. Ch. Rep. 629. Domat ————.

In fact, the principles of English and American equity jurisprudence, on this head, are based upon the civil law.

But it is said, this court, in the case of *Fetherston* v. *Robinson*, 7 Lou. Rep. 599, has decided otherwise.

Upon examining that case, it will be seen the point was not made by counsel; nor did it appear in that case, that the executor used the funds, or failed to keep proper accounts. In fact, the grounds on which trustees are chargeable, were not presented by the facts in that case. The question appears not to have been examined; and in the absence of all these things, the court, upon

BASS ET ALS.
*v.*
CHAMBLISS.

the state of case there presented, merely decided, that, as the accounts were not liquidated, he should not pay interest, &c.

But if it were a point decided, this court has several times ruled, that a single decision, particularly when not investigated, or the point examined, will not be considered as settling the law; and if, upon full investigation, this court deems it erroneous, it will overrule it. *Griffin* v. *His Creditors*, 6 R. 228. *La Grange* v. *Barré*, 11 R. 302, 310.

That case is therefore no authority upon the state of facts here presented.

According to the facts of this case, and in accordance with the foregoing principles, the dative executor is clearly liable for interest.

First, he is liable, because he failed to keep regular, stated and annual accounts, and because he did not annually present to the probate court, as required by the provisions of the Act of 1837. Revised Statutes, 564, B. & C. Digest, 499. So far from having his accounts regular, they were in great confusion; he repeatedly asks time to get them ready; he makes them out several times; he makes mistakes and corrections, and finally asks $1200 to be paid to counsel for assisting him in making them out.

Second, he is liable, because the will of *Job Bass* directs the property to be divided in 1845. He should have paid over, as directed by the will, the amount then in his hands; he failed to do so.

But third. He is manifestly liable, because he used and mingled the trust money with his own. Where the proof shows large balances in the hands of executors for years, the law presumes he has used it, unless by proof made on his part, he shows he kept it on deposit, or separate and distinct from his own, that it might always be ready when it was wanted; otherwise, the presumption that he has used it, and more particularly when he fails to keep regular and correct accounts. *Peyton* v. *Smith*, 2 Dev. and Battle, Ch. 325 ; 1 John. 510, 621. 4 John. Ch. Rep. 306. Dev. Equity Rep. 369.

In April, 1848, his account shows he made a large payment to the heirs, but it also shows that this payment was not made out of money previously in his hands, but from sales of property just then made, and even the whole of this he did not pay over.

But in his opposition, he objects to paying interest, because the money was not to be divided among the heirs until 1845. Why did he not pay it over then, and account for the *Barton* debt?

But this pretence will not avail. The principles laid down in the cases above cited, show that a trustee shall make no gain out of the fund, he must account for all it produces in his hands, although it may not be required for years.

Suppose he had purchased a house in 1841 or 1842, for $10,000 and sold it for $20,000? Suppose he loaned the money at conventional interest, and received $10,000 of interest, is it not the product of the fund? Suppose he uses it all this time, is not the interest the product of the fund? But this is not all; his using it for his individual benefit is a constructive fraud. As it cannot be identified, it becomes part of his estate, and on his death will become assets, and cannot be followed by the beneficiaries: in such case the interest or profit is by law converted into a trust for the beneficiaries. 2 Story Eq'ty, sec. 1261. Willis on Trustees, 121. *Fawcell* v. *Whitehouse*, 1 Russell and Milne, 132, 149. 2 Dev. and Batt. Ch. Rep. 339.

But the point is explicitly decided by Chancellor Kent. He says, in cases where it is proper for him to retain it or keep it on deposit, yet, if during the time he made interest he must pay it : thus clearly proving, that if he uses the *money* during the time, (the profit of which is interest,) he is accountable for it. 4 John. Ch. Rep. 305.

III. Having shown that he is liable to pay interest, the question is, what interest shall he pay, and how shall it be computed?

The Record shows two claims against him—one for $30,771, the amount due from *Barton*, the previous executor, and which was homologated and directed to be paid; the other the amount of money actually received by himself.

As he was security on *Barton's* bonds,—and it is proved *Barton's* estate was insolvent,—that debt, particularly as he took no steps to make it out of *Barton's* estate, must be charged to him, as he cannot sue himself on the bond. *Barton* used this money,—for the inventory of his estate does not show he kept it separate, and as he was ordered to pay it and did not, it unquestionably bears, at least, five per cent. interest. But we contend for more on this as well as on

the amounts actually received by himself. We contend, that, after the lapse of a reasonable time, say twelve months, within which he should be allowed to make the amount from *Barton's* estate, as he was liable for the debt as surety, and could not sue himself, the amount must be considered as due by himself, and he so should have charged it. He, therefore, has had the use of this money, which, if any one else but himself had been dative executor, he would have been obliged to pay. He, therefore, must account for the use of this money on the same principle he accounts for the use of any other money in his hands.

What, then, is the interest with which he should be charged? Eight per cent., at least, that being the amount claimed in the petition. The rule is, that in cases where he has used the money, has failed to make proper accounts, he shall pay for the profit of the money, the highest rate of interest allowed by law. In England, in such case he will have to pay five per cent., the highest rate. The highest rate of interest allowed by the law of Louisiana, is conventional interest ten per cent., and this should be charged to him; but as we only claim eight per cent., perhaps we cannot claim more. 3 Gill and John. Rep. 342. See Lewin on Trustees, 328.

But he submitted to pay eight per cent., and the evidence of *Govey Hood*, shows he understood his duty, and knew his liability, for he told *him* he would have to pay *interest;* therefore, he exacted it.

His sense of natural justice and law instinctively informed him what his liability was; and, by agreement on record, he submitted to render an account, as claimed in the petition.

IV. But whatever rate of interest is allowed under the circumstances of this case, it must be compounded, or annual rests made, or at least the interest due will be applied in the first instance to his disbursements.

In this country, policy—justice to minors—the avoiding all temptation to do wrong, and to prevent endangering the loss of the fund by its use, the courts will, in a case of great delay, and *where the money is used*, allow compound interest.

I am aware of the provision in the Code which says: " Interest upon interest cannot be allowed, unless it be added to the principal, and by another contract made a new debt. No stipulation to that effect in the original contract is valid." Art. 1934.

But this provision, like the interest law, only applies to contracts, express or implied, in which the relation of debtor and creditor exists.

The laws of the other States, in such cases, equally prohibit interest to be compounded, except where it is turned into principal by contract. Indeed, the courts go so far as to decide, that where interest is by contract made payable *annually*, and *is not paid*, still interest on it will not be allowed, because not authorized by the statute. See 7 Greenleaf's Rep. 48. 8 Mass. 48, 455. 17 Conn. 243. 13 Vt. 430. 23 Pickering, &c.

But as I have shown, interest is allowed against trustees to pay for profits made by them—it is not governed by the statute—hence, where compound interest is not allowed by the statute or common law, on ordinary debts, yet the same courts decide it may be charged againt a *trustee* who has used the funds. And this also is the rule of the civil law. And it should be so ; for the yearly interest or profits is a *trust fund*, as much as the original principal. The modern authorities show, where the money has been used, and particularly where the party has delayed, or kept inaccurate accounts, or failed to keep regular accounts, ready at all times for inspection, he must pay compound interest ; for it is presumed he made this much from the use of the money. 1 John. Ch. Rep., 624. 1 Brown's Ch. Rep. 359, cited 1 John. Ch. 625. Riley's Ch. Rep. 38. 2 Story's Equ. sec. 1277, 1278. 3 Gill. & Johnst. 343. 2 Dev. & Battle, 339. Baily's Rep. 460. 1 McMullen, 275. 2 McCord's Ch. 1. Such is the civil law, as shown by Chancellor Kent, in the above case, in 1 John. Ch. Rep.

The policy of this rule, and the injustice of withholding it, is ably sustained by Chancellor Kent, in the above case. See 1 John. Ch. Rep. 626.

V. Having, as I trust, proved the liability of the executor to pay compound interest, I will barely advert here to the pretence set up by defendant against payment of the *Barton* debt. The only defence he makes to this, is prescription. That is, he says, " I have not sued myself on my bond, nor have I sued *Barton's* estate, as was my duty, in ten years; therefore, as I have neglected

49

BASS ET AL.
v.
CHAMBLISS.

to do it, I pray the court to give me the benefit of my not proceeding against myself or *Barton's* estate." The mere statement of such a case answers the objection.

If he had not been security on the bond, and had failed to sue *Barton's* estate, so as to let it be barred, the court would hold him responsible, if it could have been made out of that estate. 9 Robinson, 405. 2 Ann. 281. 10 Martin, 708. 3 N. S. 707. And yet where he is absolutely bound as surety to pay it himself—and because he cannot sue himself—and because he has failed to charge himself with it—he modestly asks the court, to allow prescription against his own acts. A suit against him alone on his bond could have been sustained—if he could have sued himself. *Denys* v. *Armitage*, 5 Martin, 630. *Elliott* v *White*, 5 La. R. 324. *Parmele* v. *Brasher*, 16 La. R. 72.

VI.   I will barely notice one other point.

1st.   We objected to the allowance of $1200, paid Mr. *Bemiss* (after the litigation began, in which we charged him personally.) This is paid on pretence of professional assistance in filing his accounts. It is, in fact, a fee paid to defend his own acts, when personally charged. Such a charge, for merely assisting in making out an account, could not be allowed. See *Ferrer* v. *Bofil*, 11 Martin, 235.

VII.   We object to his account, because it does not charge himself with the above claim against *Barton's* estate, and others; but as these have been examined by my associate counsel, I can add nothing to what they have said, barely referring to the case of *Johnston* v. *Cox*, 13 Lou, Rep. 537, to show that the fact, that the two annual accounts rendered by him were homologated, does not bar us from showing that he has received other funds, or liable for other charges not contained in said accounts.

*Snyder & Selby*, for the executor of Mrs. *Barton* :

June 13, 1839, *Martha A. Bass*, during her widowhood, executed to *Chambliss* the obligation "A." The consideration of which, as stated in it, is to save *Chambliss* harmless, by Mrs. *Barton*, for all future losses which he may possibly sustain by having been the surety of *D. O. Barton*, her late husband, through mere friendship towards herself and *Barton*. But the consideration attempted to be proved different from that expressed in it, is that Mrs. *Barton* guaranteed *Chambliss* against *Barton's* default, because she had secretly applied the money to her use, found in the succession of *Barton*, knowing that it belonged to the succession of her father, *Job Bass*, which, if so, and *Chambliss* knowing it, as he must have known, it was his duty to collect of her, for the creditors and heirs of *Job Bass*. If this is true of *Chambliss*, as his heirs contend that they have proved it true, on behalf of *Chambliss*, it was contrary to good morals, and he or his heirs may not now be permitted to plead and take advantage of it. C. P. 19 ; L. C. 1887 and 1889. "*Ex turpi causa non oritur actes.*" 11 Wheaton R. 258. 5 R. R. 490. 6 N. S. 218. 5 N. S. 409. 3 N. S. 46. 1 Ann. 69.

"The administrator is" not only "responsible for any loss sustained by the estate through his neglect," (9 R. R. 405,) but "the curator of a succession may sue the surety of a former curator for any amount due by his principal." 1 A. R. 75, *succession of Johnson*. Therefore, if *Barton*, as the executor of *Job Bass*, had received money belonging to the latter's succession, and used it upon his own account, upon the appointment of *Chambliss*, and this coming to his knowledge, as he must have known, June 13, 1839, the date of the act " A," it was his duty as executor to collect it of the succession of *Barton ;* and if Mrs. *Barton* had secreted any of it, it was his duty to collect it from her ; and upon his failure, from insolvency or otherwise, it then became his duty as executor of *Bass*, to collect the amount of the default of *Barton*, from the surety of *Barton*, himself. This court has said, "it is the duty of courts to look with jealousy upon the conduct of those who act in a fiduciary capacity, and to take care that they do not make personal benefit from the manner in which they manage the estates confided to them." 6 Ann. 256.

It is confidently contended, that if the consideration of the act " A" was, as contended for by the representatives of *Chambliss*, it was, on his part, a dereliction of duty and immoral, and that a court of justice, under our laws, will not lend its aid to enforce it. 19 L. R. 497. 1 Ann. 76, and an indictable offence by our criminal statutes. *Clarke* v. *Scott et als.*, 2 Ann. 907, and the authorities therein cited, particularly 17 L. R. 118.

*Roselius, Bryan* and *Bemiss*, for defendants and appellants :

We shall present our points to the court in order in which the transactions occurred. First noticing the demand to render *Chambliss* liable as security of *D. O. Barton.*

1st. The bonds of *Barton* on which *Chambliss'* name appears are dated: one, 16th of September, 1835 ; the other, 1st of February, 1838. This suit was filed 24th of April, 1848 ; citation served 26th of April, 1848. The defendants oppose the prescription of ten years to any demand of plaintiffs so far as his supposed liability as security on *D. O. Barton's* bond is concerned.

2d. No judgment should be rendered against *Chambliss* as security for *D. O. Barton*, without ascertaining, contradictorily with the legal representative of *D. O. Barton*, the amount of *Barton's* liability.

3d. If above points should not be sustained by the court, defendant is entitled to recover the same judgment against the legal representative of *Martha A. Bass*, (Widow *Barton*,) here represented by *W. M. Benton*, as the heirs of *Bass* may recover against him as security of *D. O. Barton.*

4th. The accounts of *D. O. Barton* are *res judicata* between the parties, and cannot be disturbed.

5th. No funds are shown to have come into *Chambliss'* hands from *D. O. Barton*, except *Hood's* and *Chambliss'* notes for four thousand dollars ($4000), which are accounted for in his account of 3d of April, 1841, and he is not even charged with using the funds in his hands as executor, so no interest can be charged on any balance found to be due from *Barton* to *Bass'* succession against *Barton's* security ; because no interest it stipulated in the bond ; because no statute imposes interest as a penalty ; and, because *Chambliss* has not been placed in default. Art. C. C. 1930, 1931, 1932.

6th. *Chambliss* having a right to retain in his hands the share in the estate of *Job Bass* belonging to Mrs. *Martha A. Bass*, amounting to some twelve or fourteen thousand dollars, and there being at this time only a balance of account of some two thousand dollars, the plaintiffs should be compelled to collate on partition, and pay to the credit of any judgment rendered against *Chambliss* as security of *D. O. Barton*, such sum as they or any of them may have received over their share or for any money paid over to *Benton* for *Martha A. Bass*, they having paid the same pending this suit.

So far as *Chambliss* is sued to account as dative testamentary executor of *Job Bass*, we say :

1st. The account, as presented in a previous part of this brief is correct. The items which the Court ordered to be erased having been excluded, and the additions which were presented during the trial and ordered by the court added.

2d. The plaintiffs have no right to demand interest on any balance in *Chambliss'* hands as executor, unless, at least, they show that *Chambliss* converted the funds of the succession to his own use, and so far from showing that *Chambliss* converted those funds to his own use, the plaintiffs have not alleged it in any part of their pleadings.

3d. Interest can be allowed only when it is stipulated in the contract, or when the party has been put in default, or as a penalty for violating some statute—1930–31–32 C. C. No particular statute has been invoked by plaintiffs.

4th. The accounts of *Chambliss* as dative executor—the first account homologated ; second account homologated ; third account homologated—are judgments binding on the parties and cannot be disturbed by any court.

5th. Even if the judgment of the District Court was correct in allowing interest upon the various sums of money which came into *Chambliss'* hands as executor from the date of these respective receipts, it was a manifest error to go behind the homologated accounts of 1840, 1841 and 1842, to charge interest on the items of said accounts.

*Warren M. Benton*, representing his late wife, Mrs. *Martha A. Bass*, late Widow *Barton*, and one of the heirs of *Job Bass*, on the 27th May, 1852, filed what he styles an amended opposition. This the court will see is another one of those singular excrescences which have grown out of uniting two distinct and seperate causes of action in one suit. In this amended opposition various nullities and defences are set up to defeat the effect of the agreement entered into between *Martha A. Barton* and *R. J. Chambliss.* To these objections we reply :

BASS ET AL.
*v.*
CHAMBLISS.

1st. It is not pretended that the contract of Mrs. *Barton* with *Chambliss* is a donation.

2d. It is not necessary to the validity of a contract, that the consideration be set forth in it. It is only necessary that a legal consideration exists. C. C. 1888.

3d. Mrs. *Barton* was a widow at the time of contracting with *Chambliss*, and of age competent to contract. She was not the security of her husband. She was "desirous to relieve the estate of her second husband," to prevent law suits; to be able to retain in her hands some sixteen or eighteen thousand dollars which her husband had on hand at his death. The court will gain some valuable information upon this subject in 12 R. R. 113, and 19 L. R. 499. None of this large sum of money seen in the possession of Dr. *Barton* immediately before his death, and in his wife's hands, by Judge *Selby*, after his death, is pretended to have been paid over to *Chambliss.*

There is a natural equity in making Mrs. *Barton*, at least to the extent of her share, responsible for what she has used herself, or had the benefit and enjoyment of. She should first restore to the succession of her father what she took from it before she demands her portion at the hands of her husband's security.

It was understood and conceded on the trial of this suit in the lower court, that the portion of Mrs. *Barton* in her father's estate had been paid over to *W. M. Benton*, her executor, pending this suit, from the funds received from *Robinson*, trustee. If this is the fact, plaintiffs generally are bound to refund this money to defendant; they having paid is in derogation and fraud of this suit and defendant's rights.

BUCHANAN, J. This is a suit for an account instituted 24th April, 1848.

The account was filed 27th November, 1848.

Plaintiffs, the heirs of *Job Bass*, opposed the account on the following grounds:

1st. "That for the years 1839, 1840, 1841, and 1842, the executor had in his hands, as will appear from the accounts of those years, about twenty thousand dollars, for which he allowed no interest, except for the year 1839."

This claim of interest is based upon the Act of 1837, page 95, section 6.

The record shows that *Chambliss* rendered three accounts of his administration—the first on the 7th April, 1840, was homologated by judgment of court, on the 27th April, 1840, and showed a balance in favor of the estate of $20,395 25.

The second account was rendered on the 3d April, 1841, and was homologated by judgment of the 14th April, 1841. This account showed a balance in favor of the estate of $12,247 40.

The third account of executorship was filed the 7th April, 1842. It showed a balance in favor of the estate of $6,636 58. A judgment of homologation of this third account was rendered on the 20th April, 1842, which does not appear to have been signed.

The amounts received at various times between the 10th January, 1840, and the 15th January, 1842, by *Chambliss*, as executor, as shown by those three accounts of administration, are in the aggregate $56,450. But it is not considered by us that any interest can properly be claimed from the executor therefor, except upon the balance shown by the last of the three accounts, to-wit: $6,636 58. The first and second accounts have been homologated by judgments signed: and even there has been judgment of homologation rendered upon the third account, which has not been signed indeed, but that appears to have been through inadvertence, for there was no opposition made to it, nor is it now pretended that there was any error in it. Each account commences by crediting the estate with the balance shown by the preceding account; and the interest on the last balance only runs, under section 6 of the Act of 1837, from April 7, 1843, being one year after the filing of said account, by reason of

the executor's failure to file another account of administration as required by that section. The rate of interest under the statute would be ten per cent., but the plaintiffs only ask for eight per cent., which is accordingly allowed.

2d. The plaintiffs oppose the account, secondly, because the executor has not credited the estate in his account of 1840, with the interest on two notes collected, and which, it is alleged, bore interest from their date. There is an error of no importance in the date assigned by this objection to the account in which the collection of two notes said to be found. It is in reality the account of 1841, not that of 1840.

The items of that account alluded to, read as follows:

"By amount received of *Govey Hood*, one thousand dollars, - $1,000 00
'By amount of my note which was given to *D. O. Barton*, as dative
    executor, three thousand dollars, - - - - - 3,000 00

The only evidence bearing upon this ground of opposition is found in the testimony of *Govey Hood*, who swears as follows: "that he paid interest, at ten per cent., for two or three years from the maturity of the note until it was collected." And in another part of his evidence, he says that he paid *Chambliss* as executor of *Bass*, interest on the note "from its date to its maturity, or from the time it was given until it was paid." We view this evidence as fixing the receipt of interest on the *Govey Hood* note upon *Chambliss*. He is bound for that interest as cash received by him on the 7th April, 1840, amounting to $———, and this item must bear eight per cent. interest.

We charge *Chambliss* likewise as having received interest at ten per cent. on his own note on the 4th April, 1839, date of his receipt to the executrix of *Barton*, amounting to $———, and this item must bear interest as the other items of cash received and not accounted for.

We also charge defendant with a note of *H. Prentice* for $3000, and with interest at five per cent. on the same, as received by him on the ——— June, 1840. This item likewise to bear interest.

3d. The plaintiffs object, thirdly, that defendant has charged commissions, wrongfully, in the three accounts of 1840, 1841 and 1842, as well as in the account filed in 1848, upon moneys collected by him, instead of charging them upon the amount of the inventory that remained to be administered.

We think this objection unfounded. Plaintiffs further charge under this same head of their opposition that the defendant has charged certain commissions twice. This objection seems well taken. The amount thus charged twice in this account, is $1900 72.

4th. Plaintiffs object, fourthly, to a charge of $82, for commissions on a sum of $4000, said to have been collected, but which does not appear to have been collected. This objection is admitted to be correct.

5th. The fifth ground of opposition concerns a charge of $278 23 for overseeing, &c., which is admitted to be erroneous.

6th. The sixth ground is a double charge of fifty dollars for cost of a transcript. This objection is sustained, as well as that

7th. In ground seventh, being twenty dollars error of addition to prejudice of plaintiffs.

8th. The eighth ground of opposition relates to a charge of seventy-five dollars for three trips to Natchez and back, on business of the succession. There is no proof in support of this charge, which is therefore disallowed.

9th. The ninth ground of opposition alleges that an item of $92,734 55 to

the credit of the estate for sales of negroes, &c., on Point Look-Out plantation, in April, 1848, is too little by $1000.

This item is only put down in the account as approximate. The correct amount of these sales is stated in amended account filed on the 18th May, 1852, to be $95,577 76. The difference on this item is therefore $2,843 21.

10th. The tenth ground 'of opposition objects to a charge made by the executor of $5000, paid *D. S. Stacy* on the 8th May, 1838, which the opposition correctly states, was so paid, not by *Chambliss*, the defendant and accountant, but by *D. O. Barton*, his predecessor in the executorship. The opponents allege that defendant should not be allowed to credit himself with moneys paid by *Barton*, unless he likewise charges himself with the assets of the estate received by *Barton*, and not accounted for; and pray that the account be corrected by charging *Chambliss* with the sum of $35,000, for moneys so received by *Barton*, and by giving *Chambliss* credit for all sums paid by *Barton* for which the latter has not had credit in the account rendered by him to the late Probate Court.

It is in proof by an account of executorship filed by *Barton* on the 17th January, 1838, and homologated the 1st February, 1838, that the balance due by *Barton* to the estate of *Bass* at that date was $30,771 39. *Barton* died the 4th January following, (1839). On the 4th February, 1839, *Chambliss* qualified as dative testamentary executor of *Bass*, in place of *Barton*, deceased.

It was certainly *Chambliss's* duty to have used all legal means to make the balance above stated out of *Barton's* estate. Perhaps the reason he did not do so, was the fact that *Barton's* widow, who was one of *Job Bass's* heirs, and entitled to one ninth of his estate, entered into a contract of guaranty with *Chambliss*, a few months after her husband's death, by which she bound herself in the most unqualified manner, to save *Chambliss* harmless for or on account of the balance due by her late husband to her father's estate, and pledged her portion of the inheritance, by covenanting that *Chambliss* might retain in his hands the share or portion of said estate coming to her, on account of the indebtedness of *Barton* to the estate. As *Bass's* estate, per inventory, was about two hundred thousand dollars in value, the proportion coming to this heir, Mrs. *Barton*, might reasonably have seemed equal to the balance due by Mr. *Barton* to the estate at the time of his death. For it is not proved that any moneys came into the hands of *Barton* after the rendition of his account homologated on the 1st February, 1838; and upon that balance, *Barton* had paid to Mr. *Stacy*, as alleged in the ground of opposition under consideration, a sum of five thousand dollars; in addition to further credits allowed *Barton* of four thousand dollars, by the judgment of the District Court, which are not complained of in this court, and still another credit of $3000, allowed by the present judgment for a note of *Horace Prentice*. The true balance, after making these allowances, due by the estate of *Barton* to the estate of *Bass*, is more particularly shown by the account incorporated in this opinion. We are of opinion that *Chambliss* should be charged with this amount, and should have judgment, over against Mrs. *Barton*, called in warranty. But we do not think this portion of our judgment against the defendant should carry eight per cent. interest, as ordered by the judgment appealed from. This is not money collected by the executor, and which he has failed to deposit in bank or account for. It does not therefore come within the provision of the Act of 1837, which is a highly penal statute, and should be strictly construed. It is even uncer-

tain how much, if any, of this balance due by *Barton's* estate will have to be disbursed by *Chambliss's* representatives; for although *Chambliss* rendered himself liable to make good *Barton's* deficit, yet it will be equitable and necessary, to stay execution of the portion of the judgment against his estate arising from this cause, until it be ascertained what is the precise sum coming to Mrs. *Barton* in settlement of her father's estate—defendant being clearly entitled to a credit for that amount, under Mrs. *Barton's* warranty. The balance of *Barton's* account of the executorship after giving credit for the amounts of the three notes of *R. J. Chambliss, H. Prentice* and *Govey Hood*, and the *Stacy* receipt, in a debt due by the succession of *Barton* to the succession of *Bass*, and as such, bore interest at the rate of five per cent. from *Barton's* death, by the Article 989 of the Code of Practice. For this interest *Chambliss* is responsible upon the *Barton* balance, in their double capacity of surety of *Barton*, and of his successor of *Barton* in the executorship of *Bass*.

The very peculiar feature of this portion of the cause is that *Chambliss* must be viewed as having paid the amount for which he was responsible as surety of *Barton* to a person who was certainly entitled to some portion, if not the whole of the amount paid, as being one of the heirs of *Bass;* that person at the same time being bound by contract to hold *Chambliss* harmless from his said responsibility.

We are of opinion that the *Barton* balance of account of executorship, is entitled to the following credits:

| | | |
|---|---|---:|
| Cash paid to Mr. *Stacy*, | | $5,000 00 |

The following notes turned over by *Barton's* executrix to

| defendant, and by him collected—*Govey Hood*, | $1,000 00 | |
|---|---|---:|
| *Chambliss*, | 3,000 00 | |
| *H. Prentice*, | 3,000 00 | |
| | | 7,000 00 |

| | | |
|---|---|---:|
| Total, | | $12,000 00 |

Together with the interest collected by *Chambliss*, on those notes.

The eleventh ground of opposition is too vague and general to require any notice.

An amended opposition was filed on the 1st June, 1849, alleging that the defendant had not given credit for two drafts, one of $2,500, and one of $690, paid by *Atchison*. Annexed to this opposition is a statement signed by defendant. A comparison of this statement with the two accounts filed by defendant in April, 1842, and November, 1848, will show that all the drafts paid by *Atchison*, are included in one or the other of them, except that of $690, received the 5th April, 1842, with which the defendant must be charged.

This suit, after the account and oppositions filed, dragged along in the District Court until, in December, 1850, an agreement was entered into by the parties and put on file, by which the case was to be continued for another year, provided the administrators of defendant, (who had died in the meanwhile,) would pay $15,000 in cash, and as much more in city acceptances, ($30,000 in all,) on or before the 20th January, 1851. This was done.

On May 18th 1852, defendants, with leave of Court filed an amended account in which the only difference from the account filed at the begining of the suit by *Chambliss* was, the omission of several of the items objected to by the plaintiffs on the debit side (which have been already noticed in their proper place,) the insertion on the debit side of an item of $1200 for fees of Messrs.

BASS ET AL.
v.
CHAMBLISS.

*Bemiss* and *Bryan*, for filing account and settling the succession, and the insertion on the credit side of the sums paid the heirs since the institution of the suit, being $30,000 to *Sparrow & Short*, attorneys, and $556 60 to *Benton*, assignee.

The balance shown by this amended account to the credit of *Bass's* estate was $1,368 98.

Eight days after this amended account filed, the parties went to trial; and on the second day of the trial, viz: the 27th May, 1852, defendant's counsel tendered still another amendment, composed of a few items, of which the only one that is necessary to notice is, a very obvious error of $1000, in computation of commissions of two and a half per cent. on the amount of Sheriff's sales. The District Court properly allowed this amendment.

The fee of $1200 allowed Messrs. *Bemiss & Bryan* in the amended account of 18th May, 1852, was objected to, and properly rejected by the District Court.

An heir who after waiting for years, is obliged to sue an executor for an amount, ought not to pay the counsel employed to defend such a suit. It is to be supposed that he has had to employ counsel to prosecute the suit, whom he will have to pay. This is an expense which he has incurred through the fault of the executor, and we see no propriety in doubling that expense to him, by charging him with the fees of counsel who defend the suit.

Upon a review of the evidence and law of the case, we state this account as follows:

A.

*Statement of Account with Interest*, R. J. CHAMBLISS, *Dative Testamentary Executor, with Succession of* JOB BASS.

| | | | | |
|---|---|---:|---:|---:|
| | Balance due succession of Job Bass, as per account rendered 7th April, 1842,     - | | $6,636 58 | |
| | Add interest at 10 per cent. on Govey Hood's note for $1,000, from 21st June, 1838, to 7th April, 1840, 1 year, 9 months and 17 days,    .   .   . | $179 72 | | |
| | Eight per cent. interest thereon from 7th April, 1841, to 7th April, 1842, 1 year,    . | 14 40 | | |
| | Add interest on R. J. Chambliss's note at 10 per cent. per annum on $3,600, from 28th March, 1837, to 7th April, 1840, say 3 years, 9 days,    .   . | 907 50 | | |
| | Eight per cent. interest thereon from 7th April, 1841, to 7th April, 1842, say 1 year, | 72 56 | | |
| | Add amount of Prentice's note for | 3,000 00 | | |
| | Eight per cent. interest thereon from 9th July, 1841, to 7th April, 1842, say 8 mos. 28 days, | 178 66 | 4,352 84 | |
| | | | 10,989 42 | |
| 1841, April 1 | Paid Judge Bosworth for Thomas Owen,    .   .   .   . | $11 25 | | |
| 1843, Feb'y 20 | Paid S. R. Dunn for his wife, see Burke, Watt & Co.'s account, | 300 00 | | |
| March 10 | Paid Wm. Benton, tutor C. A. Bass,    .   .   .   .   . | 1,605 04 | 1,916 29 | |

*Statement of Account with Interest*, R. J. CHAMBLISS, *Dative Testamentary Executor, with Succession of* JOB BASS.

| | | | |
|---|---|---|---|
| March 10 | Actual cash balance in hands of R. J. Chambliss, on the 7th April, 1842, | | $9,073 13 |
| | Add 8 per cent. interest from 7th April, 1843, to the 20th March, 1844, 11 mos. 17 days, | | 699 64 |
| | 4th Nov. 1842, received from E. F. Atchison, | $2,029 65 | |
| | 8 per cent. interest from 4th Nov. 1843, to 20th March, 1844, 4 mos., 16 days, | 61 34 | |
| | 18th Nov., 1842, received from E. F. Atchison, | 2,029 65 | |
| | 8 per cent. interest from 8th Nov., 1843, to 20th March, 1844, 4 mos., 2 days, | 55 04 | |
| | 11th Dec., 1842, received from E. F. Atchison, | 2,029 65 | |
| | 8 per cent. interest from 11th Dec., 1843, to 20th March, 1844, 3 mos., 9 days, | 44 67 | |
| | 4th Dec., 1842, received from E. F. Atchison, | 600 00 | |
| | 8 per cent. interest from 4th Dec., 1843, to 20th March, 1844, 3 mos., 16 days, | 14 46 | |
| | 5th April, 1842, received from E. F. Atchison, | 690 00 | |
| | 8 per cent. interest from 5th April, 1843, to 20th March, 1844, 1 year, 45 days, | 62 10 | |
| | 21st Nov., 1842, received from E. F. Atchison, | 3,000 00 | |
| | 8 per cent. interest from 21 Nov., 1843, to 20th March, 1844, 3 mos., 29 days, | 79 33 | |
| | 1st Jan. 1843, received from E. F. Atchison, | 5,000 00 | |
| | 8 per cent. interest from 1st Jan., 1844, to 20th March, 1844, 2 mos., 19 days, | 87 77 | 15,783 66 |
| | | | $25,556 43 |
| 1844, Feb'y 14 | Paid S. R. Dunn, on account of his wife, | 1,000 00 | |
| | 8 per cent. interest from 14th Feb., 1844, to 20th March, 1844, 1 mo., 6 days, | 8 00 | |
| March 20 | Paid W. M. Benton, tutor of C. A. Bass, | 891 94 | 1,899 94 |
| | 1st May, 1843, received from E. F. Atchison, | 5,000 00 | |
| | 8 per cent. interest from 1st May, 1844, to 1st Jan., 1845, 8 months, | 266 67 | |
| | 1st Nov., 1843, received from E. F. Atchison, | 1,605 04 | |
| | 8 per cent. interest from 1st Nov., 1844, to 1st Jan., 1845, 2 months, | 21 40 | |
| | 11th Nov., 1843, received from E. F. Atchison, | 2,000 00 | |
| | 8 per cent. interest from 11th Nov., 1844, to 1st Jan., 1845, 50 days, | 22 23 | $8,915 34 |
| | | | $32,571 83 |
| 1845, Jan'ry 1 | Paid Stacy & Sparrow, Attorneys, for fee and bill of costs, | | 542 30 |
| | | | $32,029 53 |
| | Eight per cent. interest from 1st Jan., 1845, to 1st Jan., 1851, 6 years, or 48 per cent., | | 15,374 40 |
| | | | $47,403 93 |
| 1845, Dec'r 4 | Paid Eli Harris, Parish Judge, | 40 00 | |
| | Interest 8 per cent. from 4th Dec., 1845, to 1st Jan., 1851, 5 years, 27 days, | 16 24 | |
| 1846, Jan'ry 1 | Paid R. M. Maybin, for overseering, 2½ per cent. commissions on $23,983 99, | 599 58 | |
| | 8 per cent. interest from 1st Jan., 1846, to 1st Jan., 1851, 5 years or 40 per cent., | 240 00 | |
| July 1 | Paid B. F. Bosworth, $70 00 | | |
| | do do 250 00 | 320 00 | |
| | 8 per cent. interest from 1 July, 1846, to 1st Jan., 1851, 4 years, 6 mos., 36 per cent. | 115 20 | |

*Statement of Account with Interest,* R. J. CHAMBLISS, *Dative Testamentary*
*Executor, with Succession of* JOB BASS.

| | | | |
|---|---|---|---|
| 1847,<br>June 26 | Paid E. R. Travis, Sheriff, . . . | 250 00 | |
| | 8 per cent. from 26th June, 1847, to 1st Jan., 1851, 3 years, 6 mos., 4 days, | 70 23 | $1,651 23 |
| | | | $45,752 68 |
| 1848,<br>April 5 | 5th April, 1848, received from Sheriff for sales of negroes, mules, stock, corn, &c., | 95,577 76 | |
| | Paid Abraham Bass, . . . $16,422 56 | | |
| | " J. A. Bass, tutor C. A. Bass, 16,422 56 | | |
| | " W. M. Benton, assignee Mrs.<br>  Owens,. . . . 7,728 26 | | |
| | " James A. Bass, . 7,728 26 | | |
| | " D. S. Stacey, for Mrs. Bowen, 7,728 26 | | |
| | "   do   for R. C. King,<br>  tutor of Thomas McAllister, 3,864 14 | | |
| | " Stacey & Sparrow, attorneys, 4,500 00 | | |
| | " D. S. Stacey, attorney for<br>  Mrs. Foreman, tutrix, 3,864 14 | | |
| | " D. S. Stacey, attorney for<br>  Job Bass, .. . . 3,864 14 | | |
| | " D. S. Stacey, attorney for<br>  Sarah Morris, . . 6,728 27 | | |
| | " D. S. Stacey, attorney for<br>  E. Sparrow, assignee of<br>  Mrs. Dunn, . . . 3,864 14 | | |
| | " J. C. Drew, Sheriff, . 593 38 | | |
| | " E. R. Travis, Sheriff, . 50 00 | | |
| | "   do   do . 53 70 | | |
| | "   do   do . 23 65 | | |
| | "   do   do . 5 00 | | |
| | "   do   do . 4 00 | | |
| | "   do   do . 12 13 | | |
| | "   do   do . 8 80 | | |
| | "   do   do . 2 18 | | |
| | "   do   for keeping plan-<br>  tation, . . . 1,034 28 | | |
| | " Eli Harris, clerk, . 7 50 | | |
| | "   do   do . 124 50 | | |
| | " 13 bbls. pork, . 156 00 | | |
| | " Travis, Sheriff, . . 6 00 | | |
| | " Commissons dative testamen-<br>  tary executor, . . 2,389 42 | $87,185 22 | |
| | | $8,392 54 | |
| | Eight per cent. interest from 5th April, 1848,<br>to 1st Jan., 1851, 2 years, 8 mos., 26 days, | 1,839 00 | $10,231 54 |
| 1851,<br>Jan'ry 1 | | | 55,804 22 |
| | Amount paid Sparrow & Short, attorneys, in<br>cash and drafts on Burke & Co., . . | 30,000 00 | |
| | Amount paid W. M. Benton, . . . | 556 60 | $30,556 60 |
| | Amount due by estate of R. J. Chambliss,<br>balance in account as Executor of Job<br>Bass, on the 1st Jan., 1851, and bearing<br>interest from that date until paid, at the<br>rate of 8 per cent. per annum until paid. | | $25,247 62 |

B.

*Statement of Account with Interest,* D. O. BARTON, *Dative Testamentary Executor with the Succession of* JOB BASS.

| | | |
|---|---:|---:|
| Balance due succession of Job Bass by D. O. Barton, dative testamentary executor, on 31st January, 1838, as shown in Record, page 100, | | $30,771 39 |
| From which is to be deducted the following items : | | |
| Ten per cent. interest from 21st June, 1838, to 7th April, 1840, say 1 year, 9 mos., 17 days, on Govey Hood's note for $1,000, | 179 72 | |
| Govey Hood's note, as above, | 1,000 00 | |
| Ten per cent. interest on R. J. Chambliss's note for $3,000 from 28th March, 1837, to 7th April, 1840, 3 years, 9 days, | 907 50 | |
| Amount of Horace Prentiss' note, | 3,000 00 | |
| Amount of R. J. Chambliss' note, as above, | 3,000 00 | |
| Also, amount paid by Barton, in cash, to Stacey, 8th May, 1838. See Record, page 272, | 5,000 00 | $13,087 22 |
| Amount due by the succession of Barton to the succession of Job Bass, at the date of Barton's death, say 4th January, 1839, and to bear interest at 5 per cent. from that date till paid. | | $17,684 17 |

It is therefore adjudged and decreed, that the judgment of the District Court be reversed; and it is further decreed, that there be judgment in favor of plaintiffs against the legal representatives of *Robert J. Chambliss,* namely, *Samuel L. Chambliss, John H. Martin* and Mrs. *Mary E. Martin,* administrators of the succession of *Robert J. Chambliss,* for the sum of $42,931 79 principal, with interest on $25,247 62 of said amount at the rate of eight per cent. from the first of January, eighteen hundred and fifty-one, until paid ; and on $17,684 17 of said amount, at the rate of five per cent. from the fourth of January, eighteen hundred and thirty-nine, until paid; and that there be judgment in favor of the administrators of the said *R. J. Chambliss* against *W. M. Benton,* in his capacity of executor of *Martha A. Bass,* for the sum of $17,684 17, with interest at five per cent. per annum from the fourth of January, eighteen hundred and thirty-nine, until paid; that the plaintiffs be referred to a Notary Public or Parish Recorder, to be named by the District Judge of the parish of Carroll, for the purpose of making a partition and settlement of their respective rights as heirs of *Job Bass,* deceased; that execution be stayed upon $17,684 17, and the accruing interest on said sum as above, of the judgment herein rendered against the estate of *Chambliss,* as well as upon the whole judgment against the estate of *Martha A. Bass,* until it shall have been ascertained by said notarial partition and settlement what is the amount of the rights of *Martha A. Bass,* as one of the heirs of *Job Bass,* her father; that the amount of said rights be credited upon the judgment stayed as aforesaid, and execution be issued thereupon for the surplus only, after crediting the amount of said rights. It is further decreed, that the costs of the court of the first instance be paid by the appellants, and those of the appeal by the appellee, and it is decreed lastly, that the sum of one hundred dollars

BASS ET ALS
*v.*
CHAMBLISS.

be allowed to the auditor, *W. C. Horner*, by this court appointed, for his services herein, and that said sum be paid by the appellee.

VOORHIES, J., OGDEN, J., and CAMPBELL, J., concurring.

SLIDELL, C. J., dissenting. As there are some points in which my views do not accord with those of my brethren, I have thought proper to prepare a separate opinion.

The discussion in this case involves a subject of great practical importance, the duty and liability of a person charged with the administration of a dead man's estate. The plaintiffs are the heirs of *Job Bass ;* the defendant, the dative executor of his last will. This suit was brought by the heirs about nine years after his appointment, to compel him to render an account, and more than six additional years have since been consumed in litigation.

Before I enter upon the discussion of the legal questions presented in this cause, I deem it necessary to make a brief statement of the prominent facts to which the law is to be applied in determining the nature and extent of the defendant's liability.

*Job Bass*, of whom these plaintiffs are heirs, died nearly twenty years ago. In September, 1835, *D. O. Barton* was appointed dative executor of his last will, the executors named in the will having declined to act. The estate, with the exception of two negroes valued at $2400, consisted in nine mortgage notes for a principal sum of $185,000, maturing in annual instalments on the 1st day of January, from 1837 to 1845 inclusive. They were secured by a mortgage of a valuable plantation and slaves in the parish of Carroll, sold by *Bass* to *Nisbert*, the maker of the notes. The administration of such an estate, it will be observed, was a matter of extreme simplicity. Nothing more was to be done than to receive payment as the notes matured, or if not punctually paid, collect them by suit, and in due season distribute the funds among the children and grand-children of the testator named in the will.

*Chambliss* was the surety of *Barton* on his official bond. During his life, *Barton* rendered two accounts, the last of which exhibits a cash balance in his hands, on the 17th day of January, 1838, of $30,771 39. On the 4th of January, 1839, *Barton* died, and an inventory of his estate was made on the 21st January, 1839, at the making of which *Chambliss* was present, and signed as a witness. This inventory exhibits land valued at $17,056, and contains receipts and bills amounting to $13,010, among which were stated, "one due bill of *Govey Hood*, for $1000, dated June the 21st, 1838 ;" "one note of *H. Prentice* for $3000, dated April 24th, 1837 ;" "note of *Robert J. Chambliss* for $3000, dated March 28, 1837 ;" "Receipt of *Rowland, Smith & Co.* $1000 of Planters' Bank of Natchez, conditional, without date." The inventory also exhibited as on hand, seventy-five bales of cotton valued at $3750, and twelve hundred bushels of corn valued at $804. No cash is mentioned in this inventory, but there is testimony showing that *Barton*, shortly before his death, had in his possession a large amount of bank notes contained in a package, and that the widow, Mrs. *Barton*, had a large amount of bank notes, which appear to have been the same, after his death. It was upon the same evidence, our predecessors held, in a suit brought by a creditor of *David O. Barton*, that his widow was personally liable, having converted to her own use property belonging to the community which existed between her and her husband. See *Lynch* v. *Barton*, 12 Rob. 117.

In February, 1839, *Chambliss* was appointed dative executor of *Bass's* estate.

On the 4th of April, 1839, we find him receiving, in his official capacity, from Mrs. *Barton* in her capacity of administratrix of *Barton's* estate, the notes of *Hood*, *Prentice* and *Chambliss*, and other documents, which are described in the receipt signed by *Chambliss*, as "notes and papers belonging to the succession of *Job Bass* deceased, and which were inventoried in the estate of said *D. O. Barton* deceased, the said inventory being amended by an order of the court of probates, and an order that they should be given up." We have not evidence of the tenor of *Chambliss's* note, but there is a copy in evidence of *Prentice's* note, so called in the inventory and in *Chambliss's* receipt. It is in these words :

"$3000, Providence, April 24, 1837. Due Doctor *D. O. Barton*, executor of *Job Bass*, deceased, three thousand dollars, value received. H. PRENTICE."

In June, 1839, an agreement in writing was made between *Chambliss* and Mrs. *Barton*, in which she recites that *Barton*, her deceased husband, had been the executor of the estate of her father, *Job Bass ;* that there would probably be a large deficit for moneys that came into his hands for *Bass's* estate ; that *Chambliss* had become his official surety, without any other motive than a disinterested friendship to *Barton* and herself ; that she was desirous to relieve the estate of her husband from embarrassment, and "avoid lawsuits or any manner of litigation in regard thereto, or relative to the aforesaid deficiencies," and also desirous to relieve *Chambliss*, and hold him harmless from his suretyship ; that *Chambliss* was now executor of *Bass's* estate, and she, as an heir, was entitled to a porton of the estate in money, the amount of such portion being yet not exactly known. She then agrees that he may receive for her the proportion, whether in money or otherwise, which may come to her as heir, from her father's estate, and hold the said proportion as the same may be divided unto the heirs, in his hands, or a sufficient amount thereof, to secure and indemnify him for his suretyship, and also to secure and indemnify the estate of *Bass* from loss by the defalcation ; and she authorizes him to pay to the succession of *Bass*, out of her portion as received, the said deficiency. The argument concludes with a full covenant to hold him harmless from any loss by reason of his suretyship.

This *Barton* deficit is now estimated to be $———, he, *Barton*, having paid $5000 to a portion of the heirs, and a credit being allowed for other items to the amount of $———.

In 1840, 1841 and 1842, *Chambliss* filed accounts. They are entirely silent with regard to the *Barton* deficit, and also the note of *Prentice*. The account of 1841 credits the estate, under date of 7th of April, 1840, with $1000 only, amount received from *Hood*, and $3000 only, which was amount of principal of his own note. It is proved, however, that he made *Hood* pay him interest at ten per cent. from the maturity of the bill, to wit, its date, until it was paid. It is also proved by *Prentice*, and by other evidence, that the note of *Prentice* was settled with *Chambliss* on the 9th July, 1840, by assigning to *Chambliss* an invoice of goods, and by transferring to him, as executor, a claim *Prentice* professed to have against Mrs. *Barton*, for which a suit was then pending by *Prentice* against Mrs. *Barton* for a sum of $2821 41, which sum was credited on the *Prentice* note. It would seem from the testimony of this witness, that the settlement blended the claim as executor, with *Chambliss's* individual accounts with *Prentice*. At all events, the value of the invoice of goods which the witness, in a subsequent part of his testimony, says he sold

to *Chambliss*, is not shown, nor any where accounted for; and as to the assigned claim against Mrs. *Barton*, it is not shown that he took it under judicial sanction, nor with the authorization of the heirs. *Chambliss* prosecuted the *Prentice* suit against Mrs. *Barton*, and it resulted in a verdict in favor of the defendant, on the 30th of April, 1842. So that the claim thus taken in settlement of the *Prentice* note, proved worthless.

After the 7th of April, 1842, *Chambliss* filed no further account, until he was called upon to do so by this suit, which was brought on the 12th of April, 1848. In the meanwhile, besides the cash balance of $6,836 58, unpaid by him as in his hands on the 7th of April, 1842, he received large sums of money, partly by voluntary payments received from the mortgage debt and partly by suit upon the mortgage; and he also paid, during this interval, various sums of money to some of the heirs, on account of their interest in the estate.

The petition of the heirs presented a history of the administration of the estate, as far as they had been made acquainted with it, referred to the *Hood* and *Chambliss* notes as transactions obscure and unexplained in the account, charged him with omission of duty in having so long failed to present his annual accounts, and called upon him to file a full account of his administration. They also asked that he be decreed to give "the dates of reception of moneys coming into his hands, and the dates at which the same had been paid out, on account of the succession, or to any of the heirs, and that in said account he be decreed to raise an interest account, or show in what bank the funds in hand at the end of each year, not necessary for the current year's expenses, have been deposited; and if not deposited, that he be decreed to pay eight per cent. on all sums in his hands, at the beginning of each year, that should have been deposited as required by law. They also charged, that he had received the amount of funds which were in *Barton's* hands at his death; but if he had not actually received them, he was liable for them as *Barton's* official surety, with eight per cent. interest from the 1st of February, 1839, until paid. They also prayed for a partition, and for such other and general relief as might seem just and equitable in the premises.

On the 8th of May, 1848, the defendant, *Chambliss*, appeared and asked "further time to render his account as prayed for by plaintiffs," assigning for cause, that he had not had time to do so since the demand was made; that there was a great number of papers to examine and calculations to make, which required much time and labor; also, that the succession was yet unsettled, that there were payments yet to be made, and property yet unsold, mortgaged for debts due to the succession; that he was proceeding to sell said property, in May, 1848, for said purpose, when he had been arrested by an injunction of third parties; and concluded with a prayer that no further action be had until he could, by said sale, collect all that was due to said succession, and render a final account. It would seem the application for time was resisted by the plaintiffs; but at all events, on the 9th May, 1848, an order was made on the cause in these words: "By consent of the plaintiffs in this case, made by their counsel in open court, and of the defendant, *Robert J. Chambliss*, now also in open court, it is ordered, that the said defendant file his account as prayed for, on or before the tenth day of October next, and that this cause be continued."

On the 27th November, 1848, the executor filed an account, on which, however, he did not account for the *Barton* defalcation, nor show how he had kept

the trust funds, nor raise an interest account as prayed for, and, as the heirs with some plausibility allege, he had consented to do. The account was accompanied by a petition of the executor, praying that the account might be deemed provisional, in consequence of a litigation pending, by which the collection of the residue of the estate was tied up. Upon the application of the executor, the cause was continued, and two months was allowed the heirs to file their opposition to the account. This they did in December, 1848, and in addition to making the various objections and claims stated in the opinion of Mr. Justice Buchanan, they declared their willingness to take their respective portions of the uncollected mortgage debts, alleging that as there were now no debts to pay, there was no necessity that the executor should act any longer, except to divide the funds he had received. At the next term of the court, in May, 1849, *Chambliss* filed exceptions, evidently intended to procrastinate a hearing. They were overruled, and he then moved a recusation of the District Judge. This also was overruled, and he then applied for a continuance until the next term, on the ground of the sickness of one of his counsel. The application appears to have been successful. The cause went off until the July term, when he filed a new exception, praying all the proceedings in the suit, subsequent to the filing of the original petition of plaintiffs, be set aside as null and void, on grounds too frivolous to deserve any comment. No action on this motion appears of record; but the court adjourned without disposing of it, or trying the cause. Subsequently, from the fact that the successor of the District Judge refused to sit in the cause, it was continued from time to time, and at last was brought to trial in May, 1852. Meanwhile, in 1850, *Chambliss* died, and his executors were made parties. They made a payment in 1851, to a portion of the heirs on account; but only a portion of this, to wit, $7500, was paid in money, although a good while had elapsed, and they had had control of the crop of *Chambliss's* plantation. The residue they paid in drafts on their merchants, payable at distant dates. In the inventory of *Chambliss's* estate, no money is found, although there is a considerable amount of notes and due bills held by him at his death, and neither he nor his executors have shown where or how he kept the trust moneys of this estate. That he received large sums from time to time, his own accounts show. If he did not use it, it is pertinently asked by plaintiffs, where was it at the time of his death? If he had ever deposited it for safe keeping in the bank at Providence or elsewhere, the certificate of deposit or receipt would have shown it. It seems to me next to a moral impossibility, under all the circumstances, to suppose that *Chambliss* did not mix this trust money with his own, and use it.

From the above state of the prominent facts, with other surrounding circumstances upon which I do not think it necessary to enlarge, my mind has been brought to the conclusion, that there has been great irregularity in the keeping of the executor's accounts ; gross omission to report annually ; a mingling of the affairs of the estate with his own; an unjustifiable concealment of funds received and arrangements made with debtors; a postponement of the interests of the estate to his own; and, I am constrained to add, a use of the trust funds. There has also been a culpable continuous effort during a long period, to protract the litigation, and keep heirs, some of whom were minors, out of their estate.

That the executor should be charged with interest on *Hood's* note, having

BASS ET ALS
*v.*
CHAMBLISS.

received it, is of course too clear to require comment. Even if *Hood* was not legally bound under his contract to pay the interest, he did pay it to the executor, and the estate must have the benefit. The suppression, in his account of 1841, of the fact that he had received interest, and the giving credit as of 7th of June, 1840, for the principal only of an asset, which was in fact a due bill, dated more than three years previous, was a gross violation of duty, and must be characterized as a spoliation.

I also concur in charging him with interest on his own note. His account of 1841, on crediting the naked principal on 7th June, 1840, omits to state the material fact, that the note was dated March 28, 1837. Although distinctly called upon by the heirs to explain the history of that note and *Hood's*, and although the note was in his possession, he omits, in his account of 1848, to discribe its tenor, or explain *its* origin, nor *is it* produced at the trial by his executors. As *Hood's note* has been proved to have been a due bill, and *Prentice's* obligation, of which I will presently speak, was also in that form, and as *Chambliss* and his executors have omitted an explanation which we may reasonably believe they could have made, I think this a proper case to apply the doctrine, *omnia presumunter contra spoliatorem.*

I also concur in the propriety of charging *Chambliss* with the amount of the *Prentice* due bill. The settlement he made with *Prentice* was without judicial sanction ; it gave *Prentice* credit on a due bill, which *Chambliss*, in his receipt given to Mrs. *Barton*, declares is an asset of *Bass's* estate, for the amount of an assigned claim against a third person, which has proved utterly worthless ; the value of the invoice of goods is not shown, and, in the compromise, the interest of the estate seems to have been blended with his individual affairs. It is just to consider him, by this conduct, as having made the *Prentice* note his own, and liable to the estate of *Bass* for its amount, and at least five per cent. interest from its receipt by *Chambliss*. I will add, that the impression made upon my mind, by a consideration of the surrounding circumstances with reference to the obscure matter of the *Prentice* and *Chambliss* notes is, that these two persons, who were the official sureties of *Barton*, had borrowed of him the funds of the *Bass* estate.

I also am of opinion, that it was the duty of *Chambliss*, when he became executor, to take legal means to make the *Barton* deficit out of *Barton's* estate, and not having done so, and also being himself the surety of *Barton*, he is answerable to the estate for the deficit.

After what I have said, it is hardly necessary to add my entire and unhesitating concurrence in the doctrine, that the heirs should not bear the burden of the counsel fee of $1200.

Leaving the *Barton* deficit for the present out of view, I proceed to consider the liability for interest on cash amounts actually received by the executor, and not accounted for by annual accounts.

I have already stated the claim of the plaintiffs touching interest, as put forth in their petition. I consider it substantially a claim for an interest account at eight per cent. with annual rests ; and under this claim, the allegation of the failure to render accounts, and the prayer for general relief, I think the plaintiffs entitled to the benefit of the 6th section of the Statute of 1837, allowing ten per cent. interest in certain cases, up to the point that eight per cent. interest calculated, with annual rests, would reach. A calculation of eight per cent. interest on a given sum upon the principle of annual rests will de-

monstrate, that eight per cent. interest with annual rests, is equivalent to running interest at the rate

| | | | |
|---|---|---|---|
| for two years of about | - | 8⅓ |
| for three years | " | - | 8⅘ |
| for four years | " | - | 9 |
| for five years | " | - | 9⅜ |
| for six years | ' | - | 9¾ |
| for seven years | " | - | 10 1-5 |
| for eight years | " | - | 10⅝ |
| for nine years | " | - | 11 1-10 |
| and for ten years | " | - | 11 3-5. |

The plaintiffs have therefore substantially asked what would probably be found on calculation to amount to more than ten per cent, and should have, therefore, in my opinion, the benefit, up to ten per cent., of the Statute of 1837.

But if it be otherwise, and the plaintiffs are to be restricted to eight per cent. simply, and without the benefit of annual rests, from what time should the eight per cent. interest begin to run? My opinion is, that it should begin under the statute, to run on items omitted in previous accounts, and that ought to have been included in them, at a date one year from the time when he received the omitted item and failed to account for it. Thus, in the present case, I think the eight per cent. on the $300 received by *Chambliss*, for interest on *Hood's* note on the 7th of June, 1840, should run at least from 7th June, 1841 if not, perhaps, from 3d of April, 1841, date of filing his annual account after receipt of that item. I am also of opinion that the eight per cent. interest should run at least from 7th of June, 1841, upon the omitted interest of $—— on *Chambliss'* own note. I am also of opinion that eight per cent. interest should be charged to him upon the amount he owes for the *Prentice* note, at least from the 9th July 1840, being one year from the day he made the *Prentice* note his own debt. I conceive it would be erroneous to make a distinction between cash actually received by an executor, and a liability he has incurred at a particular date, for a sum of money by reason of his mal-administration.

To establish these principles, I proceed to notice the language of the statute, and consider its spirit and policy.

The language of the 6th section of the Statute of March 18, 1837, p. 96, is as follows : Be it further enacted, &c., That all executors, administrators, curators of vacant successions and syndics, shall, at least once in every twelve months, render to the Probate Court a full, fair, and perfect account of their administration, and on failure to do so, shall be dismissed from office, and pay ten per cent. per annum interest on all sums for which he may be responsible, from the date of the expiration of the twelve month's aforesaid.

Now, it must be observed with reference to this section :

1st. That it is not necessary for the imposition of the burden of ten per cent. that the executor, &c. should have been called upon to file his account. The law commands him absolutely to render an account at least once in every twelve months. His failure to do so, subjects him to the burden.

2d. The annual account thus prescribed by the law, is not a mere account of any sort. It must be a *full, fair* and *perfect* account, or as expressed in the equally explicit and stringent language of the French text, un compte *entier, juste* et *parfait* de leur administration. Now, when a trustee who is actuated by the selfish and unfaithful motives which, I think, are justly attributable to

51

this executor, omits to mention cash he has actually received, and amounts for which he is clearly liable, it cannot be said, *quoad* such omitted items, that he never rendered a full, fair and perfect account. As to them, he is to be considered in the same light as though he had rendered no annual account at all. Whether the ten per cent. should be imposed on an executor, who had omitted an item on filing an account, by an honest mistake, or under circumstances presenting some grounds of explanation consistent with fair intentions, is a question not necessary now to consider.

Nor is it necessary now to say, whether in every case the interest under the statute should run on amounts not duly accounted for, down to the time of satisfaction, or only to the time of actually presenting a full, fair and perfect account. I think there is, in the present case, no equitable reason to arrest the interest at the time of filing in this suit the forced and imperfect account of 1848.

3d. The statute does not say he shall be charged ten per cent. interest only on cash actually collected. Its language is, " *on all sums for which he may be responsible.*"

Let us here consider also the spirit of this statute, as deducible from the section already noticed, and the context. I conceive the motive of the lawgiver to have been to keep persons acting in a fiduciary capacity from temptation to use the money of estates entrusted to them, by requiring them to deposit in bank under an enormous penalty, prescribed in the 3d section, and to render annual accounts as prescribed in the 6th. It is clear, from the severity of the law, that a great evil had existed, that there had been great abuses in the administration of such trusts, and this evil it was the object of the Legislature to remedy, by prescribing certain duties to persons clothed with such trusts, and imposing certain penalties for their non-fulfilment; so that in future, the funds belonging to heirs, creditors and minors, should be kept sacred, and not used for the profit and convenience of the trustee. And I also infer, from the language of the 6th section, and the penalty inflicted, the presumption of the lawgiver, that a trustee who fails to render an annual account, has an improper motive for doing so, and should respond at the rate of ten per cent. for the profit or convenience which he has personally derived from the trust fund, of which he has rendered no account. Why, in the antecedent section, should an interest of twenty per cent. be imposed upon the executor, &c., who fails to deposit in bank, from the time the money came into his hands, except upon the hypothesis that the party has avoided its deposit in order to use it.

In seeking for the spirit of this important law, we may derive assistance by considering how persons acting in a fiduciary capacity, are treated by courts of equity in England and our sister States.

In the decisions of Courts of Equity in England and America, it is treated as a principle of universal jurisprudence, that trustees can only hold and act for their beneficiaries; that all gains enure to their benefit; and that interest, sometimes simple, sometimes compounded, will be given as the standard or value of the money used. The trustee is held liable for interest where he does not keep accurate and regular accounts, so as to be always ready with them when necessary, to be examined, or where the law requires them, or where he omits to distribute at the time required by law, or the terms of the trust, or where he mingles trust money with his own, or uses it, or trades with it, or

makes a profit on it by way of interest or otherwise. 1 John. Ch. 85. 2 Story's Equity, 1277 *et seq.* Lewin on Trusts, 324 *et seq.* 4 John. Ch. 302.

The Roman law sometimes inflicted a grievous interest in the nature of compound interest, but greatly exceeding it, on a trustee guilty of a gross abuse of trust. Story's Equity, 1279.

Le tuteur ne peut employer secrètement les capitaux du pupille à son avantage personnel; il devrait en payer l'intérêt le plus élevé. Mackeldy, Manuel du droit Romain, p. 301, in note.

Quæ autem sunt pupillares usuræ videndum est? Et apparet hanc esse firman usurarum, ut ejus quidem pecuniæ, quam quis in usus suos convertit, legitimam usuram præstet. Sed et sii negavit apud se esse pecuniam, et prætor pronunciavit contra eum, legitimas solvere debebit; vel si moram depositioni fecit, et prætor irrogavit ei legitimas. Sed et si dum negat aliquam quantitatem penes se esse, pupillis ad onera sua expedienda imposuit necessitatem mutuam pecuniam legitimis usuris accipiendi, tenebitur in legitimis. Item si a debitoribus legitimas exegit. Ex cœteris causis secundum morem provinciæ præstabit usuras, aut quincunces, aut trientes, aut si quæ aliæ leviores in provincia frequentantur. Digest, lib. 26, tit. vii. leg. 7 § 10.

With regard to the *Barton* deficit, the plaintiffs have simply claimed interest at the rate of eight per cent. per annum from the date of his appointment, and not interest by annual rests.

It was the duty of *Chambliss*, as soon as he became executor, to collect the *Barton* deficit from *Barton's* administratrix, or from himself as the official surety of *Barton*. If he had done so, he would have had in his hands in a reasonable time after his appointment, say in January, 1840, the cash for that defalcation. If in his next annual account he had reported this as cash in hand, the heirs might have applied to the court for payment out of it, or to have an investment of this large sum ordered for the benefit of the estate until the proper period for a distribution arrived, which investment would have been a common benefit to all the heirs.

But he did not do this. He did not get the money, and on the contrary promised, in substance, not to exact it from the principal debtor, or his widow in community, until a distant period. Having done this without the consent of the heirs, or judicial sanction, I think he ought, as to their share, to account to them with interest, especially as the arrangement concerned his individual interest as surety.

If he had come forward in his next annual account, frankly and candidly, as a trustee is bound to do, especially in a matter in which he had a deep personal interest, and explained to the heirs the arrangement with Mrs. *Barton*, they could then have exercised their option either to repudiate or approve it. But he acted without their knowledge or consent, as far as the evidence informs us, and without judicial sanction.

To release him, and by consequence Mrs. *Barton*, from interest on this large sum for fourteen years and upwards, does not seem to me equitable either as between the heirs themselves, or as between the heirs and the executor.